The Chamberlain Group, Inc. v. Techtronic Industries Co. Ltd. bottom of page 8, Judge concluded that the only reasonable way to reconcile the difference between Claim 1 and Claim 2 is that Claim 1 eschews condition sensors in favor of a controller that does not rely on external sensors. So it appears to be understanding Claim 1 is disclaiming condition sensors because it sees Claim 2 claiming condition sensors. So none of the testimony from CGI relied on that. So the judge was hearing three days worth of testimony. The testimony was that you can't use that information to satisfy the limitations in Claim 1. So when the judge is making these statements, he's doing it on the backdrop of three days of testimony and extensive testimony from Dr. Ryan, who said that you can indeed have external controllers. He called it the Menard approach. It's the prior art approach. You can have those. You can add that into the invention. But you can't use those to satisfy the limitations of Claim 1. So Claim 1 precludes the ability to use that external sensor information to meet the limitation of being self-aware. And again, I'm using the shorthand for self-aware. Over and over again, we reinforced to the judge that that is just shorthand. It's really the first clause in Claim 1 about the controller having potential status conditions. External controllers are not sending potential status conditions defined by states. They're sending their states. So there's a lot of testimony on this in clear differentiation between a controller who can know the states it might be in versus a controller receiving an actual state of the garage doors closed from an external sensor. Do you agree that the district court shouldn't have relied on the prosecution history as a way of understanding the limits to Claim 1? I don't think the prosecution history is overly instructed here. I don't think we need to get there because it's not that we're trying to import some limitation into the claim, which in fact TTI is. If you look at their claim construction that they're proposing to the district court now, they're changing all the language. So getting back to Claim 1, we're talking about a self-aware controller? I mean, that's how I should interpret that phrase in the first clause of the claim. A controller having a plurality of potential operational status conditions. I should kind of in my head translate to being a self-aware controller. That's the terminology that Patton uses at Column 4 is shorthand. I guess the next question is how would a self-aware controller accomplish all of these different functions recited in Claim 5? Like, for example, detecting a likely presence of an obstacle to movement of the movable barrier to the garage door. I mean, I can understand a self-aware controller in the sense that it already knows that it opened the garage door, so it knows that the next action would be to close the garage door. Or the controller already knows that it believes it turned on the light, so it knows the next action it could take would be to turn that light off. And in that sense, it's self-aware. But I don't get at all how the controller could detect the presence of an obstacle to movement of the garage door, unless it was relying on an external sensor. So, first I would say that have I do believe comes into play on this, because the interpretation of whether those could be performed by the controller or the sensors, there was testimony on that, and Dr. Byron provided testimony on that. As to whether the garage door can detect an object, when there is an object, the garage door, which is starting to close, will reverse direction. So the garage door knows, I reverse direction. And based on that, it could have logic to know that if it reversed direction, there's a likely presence of something in the way of the garage door. To get it to reverse the door, it needs to sense a reason to reverse the door, right? And that would require a sensor, wouldn't it? It does require a sensor. There are sensors required by law at the bottom of the door, I believe four to six inches from the bottom of the door, that do detect a presence. But what's happening in that claim is that it's not relying on a state of, a state set from the external sensor that something is there in order to be self-aware. It's self-aware because it knows what its motor did. And yes, the motor triggered based on that, but the controller itself still has a state diagram, and it still knows what it's doing, and it can detect the possible presence of an obstruction based on the fact that it reversed direction. So you're saying that, assuming my dog is at the base of the garage door, and the door is closing, and then there's external sensors that recognize that there's some obstacle, i.e. my dog, blocking the bottom of the garage floor, then the external sensors will notify the controller, you know, you need to reverse course. And then once the controller is reversing course, you're telling me that that is information that now the controller possesses, that it now itself has detected the likely presence of an obstacle to the movement of the garage door. That's the theory. That's correct as to if it's self-aware on that particular element. That is how it would be self-aware. And certainly if somebody were to just take the information from the sensor, and the controller just sends that right out, that's not meeting the limitation of the claim, of Claim 1. It would have to actually be self-aware as to whatever that item on the list was. And again, there was extensive testimony that Claim 5, that those items in that list, the controller could be self-aware of them. It could also be that that information comes from an external controller, in which case that would not satisfy Claim 1. Do you happen to have the site to the extensive testimony on how all of these functions can be performed by a self-aware controller? There was one, I'll provide one, let me just pull it here. Dr. Ryan was asked a question in particular, and I believe this is in the briefing, about a vehicle. Right, this is the redirect, right? That's correct. He was asked about, exactly. 6144-45? 6114-45. Okay. That's correct. Where he initially testified on direct, because he was asked just off the top of his head, did he know of a way of doing this? Did he know of a way of detecting a vehicle's presence in close proximity to the garage without a sensor? And he said, I can't think of one. And then when he was asked about Homelink, which is Chamberlain technology that's in the garage door, the buttons that you have in your car, that's all originated from Chamberlain. When he was asked about that, then he recognized that, yes, you can have, you can detect the presence based on the fact that your signal came from Homelink. That's not a sensor. That's control data. But that was an example that he gave of, that he could come up with. And there wasn't, this particular Claim 5 was not, and I may have overstated when I said extensive testimony, there was testimony on this. It was challenged. At some point, TTI stopped challenging the expert on that point, but there was testimony on this. Have your prices to Home Depot or anyone else gone down since the infringement here? They have, they have. I know Home Depot's retail prices fluctuated in terms of your sales prices to Home Depot. Yes, we've had to offer rebates. But then you stopped giving rebates. Well, then we were in negotiations at the time of the preliminary injunction hearing. So TTI was under pressure to give more rebates by Home Depot. When we had the hearing, they were in the midst of negotiations with Home Depot. They have subsequently offered rebates since then. It's not in the record because it wasn't part of the PI hearing. And the price has maintained at the same level of $244. So now the $268 model has been repressed in price this entire time. You can go on the website and look. It's still $244, the price below the Ryobi model. Unless there are further questions. That will be fine. Thank you, Ms. Vidal. Thank you, Your Honors. Mr. White has four minutes left for rebuttal. Thank you, Your Honor, and I'll try to be brief. On this notion of the court using self-aware as a shorthand for something else, that was an issue that was never raised, never argued below, and you won't find that anywhere in the order. That's a new argument we heard from Chamberlain only in these proceedings, in the briefs, and I suggest there's just no evidence to support that at all. This idea that external censors were denigrated in the patent, that also is false. External censors were embraced in the patent. We read it in Column 4. You see it in the claims. For them to claim external censors and say they're somehow denigrated flies in the face of what's in the claim language directly. The self-aware controller, as Judge Chen, you pointed out, if you adopt the construction, it renders Claim 5 inoperable. That cannot possibly be the right construction here. You also heard Chamberlain suggest that- So far, in what you're saying now, you have not said anything that's a reason to reject the construction under which it has to have the ability to, and I don't have any trouble at all using the term self-aware as a complete shorthand for the notion about where the information that's being sent to the smartphone is coming from. As long as it has that ability, it can have anything else you want. So Claim 5 would be consistent. Claim 2 would be consistent. What is wrong with the claim construction that says it has to have this ability? That's actually pretty key to our invention. It can have all the other bells and whistles, but it's got to have that. Again, the best thing I can point you to is I think that that would exclude the embodiment that uses sensors for the information. If you say it has to be self-aware, then you could never have the scenario where it just relied upon external sensors, and so I think you'd be eliminating one of the two embodiments expressly disclosed in Column 4. The other thing that I would point is one of the arguments you heard is that Chamberlain never suggested that Claims 1 and 2 were sort of mutually exclusive, that they somehow can work together. But I think Chamberlain, and we put this in our reply brief, bears some responsibility here for this confusion because if you look on their briefing, and this is at the Joint Appendix 3091, we have a statement from them. This is from Chamberlain's brief that says the 275 patents Claim 1 recites the first scenario, referring back to that Column 4, the first scenario where the controller is self-aware. And the 275 patents Claim 2 corresponds to the second scenario by reciting and relying upon external sensors. So they were the one that tried to drive this wedge between Claim 1 and Claim 2 and really introduced this confusion into the proceedings and into the judge's order. If the claim were to be construed in the way that I keep talking about, what is the best prior art that raises a substantial question of validity? I think both Menard and Tizumi. So we've explained in both briefs that they do show a self-aware controller. They are aware of information that's not derived from external sensors. And because of that, we think that that would meet, even if you require a self-aware controller, that both of those pieces of prior art would show that. One last piece I want to touch on just briefly is we also raised the issue of the insubstantial or insignificant findings on irreparable harm. You've touched on a couple of pieces of that. I've got less than a minute left, so I'm not going to go into detail on that. But we believe for the reasons stated in our briefs, that is a separate, independent basis for you to vacate the preliminary injunction on just that ground alone. Thank you, Counsel. We'll take the case on revisement.